who is for the group of appellants including Vaughn. Go ahead. Thank you your honors. May it please the court. New Orleans has affected a taking by prohibiting the appellant homeowners from renting their homes for any period less than 30 days and violated section 230 of the Communications Decency Act by impermissibly requiring Airbnb to monitor third-party listings on its platforms. As to the former, New Orleans has appropriated historically grounded property right. Indeed the city's prohibition here implicates not just the historical right to lease one's property but also intrudes on the fundamental property rights to exclude and include people on your property. The ordinance constitutes a per se taking and certainly flunks the Penn Central test as well. As to the former, New Orleans cannot limit the takings clause to circumstances where the government takes the property interest for itself or gives it to a third party like the labor organizers in the Supreme Court's Cedar Point case. The government also can appropriate fundamental sticks in the bundle by simply precluding property owners from exercising a fundamental incident of property ownership. That was true of the right to devise in the Hodel case, Hodel v. Irving in the Supreme Court. It was also true of the right to walk on one's own beach in the recent Walton County case out of the 11th Circuit. The taking here is even more clear if you move from per se takings to the Penn Central test. Indeed this is the rare case where the first two prongs of the Penn Central test are essentially conceded and the Supreme Court in its lingual decision makes crystal clear that it's the first two prongs that are really the critical prongs and the third prong, the way the court phrases it, it may also be matter in certain cases. But it's really, you know, the heart of the Penn Central test is the first two prongs and they're conceded here. And I think they're conceded with good reason because if you look at the individual circumstances of the appellants here, these are people who invested $77,000 to renovate their homes, spent tens of thousands of dollars to renovate their homes in ways that were particularly situated or attuned to kind of short-term rentals as opposed to longer-term rentals. They did all that during periods where New Orleans allowed them to take advantage of short-term rentals. When they took advantage of that, they earned substantial income. Mr. Bowden, for example, earned in the two years before this 2023 ordinance came in, earned $50,000 on renting the carriage house. So under those circumstances, I suppose I can understand why the city concedes the first two prongs of the Penn Central test, but I do think that goes a long way to creating a Penn Central problem for them. And as to the third prong, I think they have a significant problem here because this is not something where there, for my clients, there's a minor intrusion on the right. I mean, this operates as to, you know, some of my clients. But isn't New Orleans concerned about a lot of stuff happening that they think is a problem and that's why they pass those rules? Well, two things, Your Honor. I mean, first, you know, as this case comes to this court on this record where a motion dismiss was granted, they actually don't concede that the reason for this particular ordinance was to protect the hotel industry. Now, you know, they may, if we got past the motion to dismiss stage, they may try to bring in some of these other concerns. But that's the record that we are adjudicating here today. But the second thing I would say is, you know, this is one of these classic taking principles where there's a problem when the government tries to impose on particular homeowners burdens that really should be distributed among all the citizens. And, you know, if the problem is noise, put noise on it. If the problem is kind of undue sort of interference with parking on the streets, change the parking on the streets. Change the rules. Say you have to park only so long or you need a permit. But there are plenty of ways to address the legitimate concerns that New Orleans has that wouldn't say, as to particular homeowners, you can't rent your house for any period less than sort of 30 days or less than 60 days in the French Quarter. And so this seems like, again, a classic situation where burdens that should be spread to address these problems throughout society are being visited on particular homeowners and in particularly dramatic ways. And, you know, the way the New Orleans has done this, giving this valuable right based on a lottery, I mean, you know, creates this dynamic where one person on the block is going to enjoy this valuable right to rent their house short-term, make $50,000 a year, and somebody across the, you know, just down the road, just down the block, isn't going to have that same right just because they lost the lottery. And, I mean, you know, if we weren't talking about a property right that is protection under the Takings Clause, maybe the government can do things that are arbitrary. But when you come to a fundamental incident of property ownership, even if you don't think we're quite at the per se stage, I think this is the kind of thing that is a classic Penn Central problem. Could you tell me what is the worst thing for Airbnb in this arena? Sure. For Airbnb, I mean, I think I'd then shift to the Section 230 provisions because, you know, I'm here representing both the individual homeowners and representing Airbnb. And the reason I'm representing both is the 2023 ordinance sort of gores the ox of the homeowners and the 2024 ordinance gores the ox of Airbnb. And it particularly does it in ways that I think implicate Section 230 of the Communications Decency Act. And the particular problem, and it's really a problem my friend never answers in his brief, is that the way this regulation is written, it focuses on the listings and it imposes a duty on Airbnb to monitor the listings to make sure that the listings are kind of compliant with all the various provisions that New Orleans and restrictions that New Orleans puts on the individual homeowners. And for purposes of that, New Orleans can do whatever it wants with respect to the homeowners for purposes of Section 230. The homeowners aren't going to have any rights under Section 230. But what Section 230 doesn't allow New Orleans to do is essentially put Airbnb in the position of sort of a designated law enforcement officer where they have to monitor the listings to make sure that the listings that are on the site are for listings that are validly rentable under the various ordinances. And you know my friend in his brief sort of says don't worry about it. The specific phrase that they use in their brief that I think is worth focusing on is they claim that Airbnb is quote free to have its website cluttered with unpermitted short-term rentals. Now I think there's two problems, pretty fundamental problems with that submission. The first is that they offer that sort of submission without any textual analysis of the ordinances in the way that they work. And like I'm sure New Orleans is entitled to some deference in interpreting its own ordinances, but they need an argument. They need to give us an argument as to why this ordinance and particularly if you focus on A4, just to be precise this is 26, 622 A4 of the ordinance, it basically says that each listing must be verified. Each listing must be re-verified at least every 30 days of the prior verification. Each listing must be re-verified whenever a verifying entity knows or should know that any data it used to complete the most recent verification has changed. And so I think there's two things that are really telling about the way that ordinance is written. First, I mean it's directly operates on the listings. So it isn't a provision that's narrowly focused just on sort of the point of sale transaction or something like that. It focuses on the listings. And the second problem is it creates this ongoing verification regime and that's precisely what this court said in the AB against Salesforce case is a problem under Section 230. You can't impose that kind of monitoring requirement on a platform. And I think if you take even a step back, I mean I think the whole thrust of Section 230 and even more recent Supreme Court cases like the Cox Broadcasting case, like Tom Nugget's Twitter, all of those cases kind of stand for the proposition that you can't go after third parties, particularly third parties as publishers, for the sins of individual users of those services. And another theme that emerges from my friend's brief on the 230 issue is this really isn't about imposing a duty as publisher. It's about imposing a duty to ensure that you're not making profit under unlawful, from unlawful transactions. But with all due respect, that just doesn't work. I mean the framework of making profit from unlawful transactions, that's exactly what the copyright holders, represented by yours truly, tried to say was the problem in the Cox Broadcasting case. And the court rejected that unanimously. That's precisely what the plaintiffs in the Tomna case tried to say was the problem there, that Twitter was making money off of terrorism because of their particular business models. And I think the lesson of those cases and the lesson of 230 is that's not the way to approach these problems. With respect to if you think there are non-compliant listings, go after the person who's trying to rent their property. And if they're renting a property that they're not supposed to rent because, for example, they have an outstanding tax lien on the property. The way I understand these regulations, if you have an outstanding tax lien or outstanding government lien on your property, you can't engage in short-term rentals. That's a heck of a thing for Airbnb to try to have to monitor on an ongoing basis. But that's precisely the kind of burdens that this puts on it. I think it's on Airbnb, and I think it's most clear in A4 little 3, where it has this known or should have known standard. It's kind of a classic, kind of, like it's not just what you know. It's what you should know about the status of the property, and then it attaches specifically to the listing. The other thing I'd say about this is that, you know, the problem isn't limited to A4 of the statute. It also, in fact, is essentially A1. And the way that this statute generally works is it creates a violation if you are conducting, facilitating, or completing any booking transaction for a non-complying dwelling, short-term dwells. And the, I think the phrase in the disjunction, facilitating or completing, is problematic, for instance, because their argument essentially in the brief is, don't worry about this. All we're trying to focus on here is completed transactions. But you can't have a statute or an ordinance that focuses on completed transactions only if the way that the ordinance is written is it prohibits both facilitating or completing those transactions. And presumably the way in this context Airbnb would facilitate an unlawful booking transaction is by having a listing on its website for a non-compliant listing. So, and just, you know, the other thing I'll say about this, and then I'm happy to answer any other questions the Court has, but the last thing I'll say about this is this is another area where there is, you know, in the status of this litigation, there is something specifically on the record that addresses this. And so this is a record on appeal 582. The countrymen declaration specifically says that in order to come into compliance with this word ordinance, Airbnb would have to limit its listings to compliant listings which would require this ongoing monitoring. And again, maybe the city has a theory as to why that's factually not true, but I think at this record since the District Court granted the motion to dismiss in their favor, we have to take the record in the light most favorable to Airbnb. And I think in applying the functional test that this Court applied in the Salesforce case, this is a situation where Section 230 is plainly violent. So if the Court has no further questions, I'll reserve my time for rebuttal. Okay, yes, you have rebuttal. Thank you. And now we will hear from Markey for New Orleans City. Good morning and may it please the Court. I'm Sean Markey for the Appellee in the City of New Orleans. Your Honors, the District Court's opinion was thorough, well-reasoned, and rightly decided. I will address both of the appellant's assignments of error starting with the takings claim and then moving to Section 230. To begin, I would like to emphasize that the City briefed the takings issues extensively only out of an abundance of caution. Before engaging in the argument of my friends here, I want to emphasize that this issue has already been disposed of in favor of the City. My friends have posited an unsupported legal theory that has been foreclosed by three separate unanimous panels of this Court. Each of these panels affirmed that operating a short-term rental in a residential area is unquestionably a privilege and not a right. Regulating commercial activity in a residential neighborhood falls squarely within the City's zoning authority and police power, and this Court and others have recognized that. Are you relying on Hignell? Yes, I am. Okay. The panel in Hignell 2, and this is directly on point here, said that no fundamental right is implicated by the City's short-term rental ordinances. The appellants cannot ignore this holding. In their brief, appellants are attempting to distinguish Hignell 2, dismiss it, and argue that it's not procedural here because in Hignell 2, the appellants were asserting fundamental rights in support of a takings claim, while here, I'm sorry, they're trying to distinguish Hignell 2 here because this case involves a takings claim, and that case involved a substantive due process claim, but they have cited no authority to support that contention. And the first Hignell panel already explained why they cannot. In the first Hignell opinion, the panel examined the relationship between these two types of constitutional claims and how they've been analyzed by this Court, and reminded us that articulating a cognizable takings claim under the Fifth Amendment requires significantly more than the procedural protections mandated by the 14th. Showing that an alleged property interest is so deeply rooted in custom that entitles a claimant to just compensation, they noted, should be a difficult hurdle to surmount. It's simply not plausible, Your Honors, that an unenumerated fundamental right, which does not exist for the purposes of substantive due process, can somehow exist for purposes of the takings clause, and they've provided no example of such a case. And here, as both Hignell panels have noted, plaintiffs are essentially seeking to operate an unlicensed business out of their home. It would make no sense that this Court would find that the city has the ability to regulate this business as a privilege, and at the same time find it also represents a fundamental right which cannot be abridged. The city's permitting regime for transient lodging is no different than the city licensing the operation of a neighborhood bar or restaurant, of which there are hundreds in New Orleans. And make no mistake, what appellants are advocating for is the unfettered ability to run a hotel at any residential address in America. This would upend well-established municipal zoning authority, going all the way back to the village of Euclid versus Amber Realty. It's also contrary to... So it's the issue that, you know, people living in a certain area just kind of want to have a calm life, and if all of these people are coming in for just a couple days, they're running around, all of that. Is that the issue in this arena? Yes, Your Honor. We were speaking about... My friends have briefed extensively about the rights of the host plaintiffs, this select few New Orleans residents here, but I think the concern should be the property rights, the right to enjoy, quietly enjoy your property that everyone has here. These are... Everyone else in the world, not just... Yes, so that's the issue. It's kind of between those two in a way. Yes. Is that fair to say? Okay. Yes, it is. But I try... I'm trying to understand the Airbnb is in a little different arena from the houses. So what is your best argument and your best case on the notion that the rules on Airbnb are improper? I would say that it's this court's opinion in Salesforce. Our ordinances comply with the standard of that case and with the functional test of that case. In their briefing, the appellants took issue with our reliance on HomeAway because they claim that we were doing a superficial analysis just looking at the text and not the practical effect of the ordinance. But I would note that they've offered no facts here. This was dismissed on a 12b6 motion and you could apply the functional standard of Salesforce to the facts of HomeAway and reach the same conclusion. I'd like to speak broadly about why our ordinance complies with Salesforce. First, Airbnb is not required to do any of those publishing activities that are identified, which is monitor, screen, and delete. As my friend pointed out, Airbnb is free to host any number of listings for unlicensed rentals. They simply cannot collect a fee for facilitating the booking transaction. Airbnb protests that because of the nature of their business, they must take down listings as a result of the ordinance, but that decision is their own. It's a business decision. And as the district court noted, they are free to have their website cluttered with unlicensed listings, but the city is not requiring them to take them down. They point to the monitoring activity highlighted in CivicSource, but monitoring is not the same thing as verification. And that's all that our ordinance requires. Airbnb does not even have to engage with the content or even review a posting of its users to verify their legality. They must simply check to see if the permit number for the listing is contained on a list which both the city and Airbnb have access to. This was the computer system that the two parties worked on at the beginning of last year. It's a registry, a To confirm, to verify that the listing itself is lawful. And that's exactly what the HomeAway case stood for in Santa Monica. All that was required in that case was to make sure that the permit was valid. It was on a list. They don't have to engage in the content that the users post at all. They're not acting as a publisher. This is data they're looking at, not content. But if the permit is invalid, what do they have to do? They're not required to do anything. Nothing? Nothing. You just want them to know. They just can't collect a fee. The city just wants Airbnb to know. Well, it's still their prerogative whether they want to. What we're regulating is the transaction. It's not the content of these posts. It doesn't, you're not logging on to Airbnb to get a property owner's opinion on current affairs or watch a video. Users are logging on to Airbnb to book transient lodging. And this is a, this contrasts directly with much of the... Are you saying they're checking to see if a permit is on a list? Is that what you're saying? Yes. Yes, Your Honor. What if it isn't? If it isn't, they can't collect a fee for it. They would be penalized for collecting a fee. The, it's for that reason that the social media cases they cite, Doe versus MySpace, Doe versus Twitter, it's why those are inopposite and inapplicable here. While Airbnb does host third-party content, the purpose, as I said, of navigating to that website is to engage in this transaction. By contrast, the users of social media sites like MySpace and Facebook are going there to view content. Those companies make their money through advertising or by collecting what Airbnb is doing. Again, you're logging into Airbnb to book transient lodging. But, but most importantly, the sales force is applicable here and the city's ordinance ordinances comport with sales force because, as the panel pointed out in that case, Section 230 immunity is not a blanket immunity. They, the panel made clear that internet service providers cannot evade the duties created by other statutory regimes. In that case, the panel noted that a provider still owed a duty to the public to not knowingly benefit in a sex trafficking venture. This duty was not that of a publisher, but rather the duty not to facilitate unlawful activity. And granted, that's a far more heinous unlawful act than it's an issue here, but this is exactly the same principle and that's exactly what the 2024 ordinance is accomplishing. In order to operate a transient lodging business in a residential area, a host must have a valid commercial license to do so. What is the purpose of the 2023 ordinance? The short-term rentals in residential areas. Excuse me? Is that in the record? Yes, it is, sir. Your Honor. Where? It's, I believe it was included in the addendum by the appellants and it's referenced throughout the briefing, but that, that ordinance was to address the problems that the various studies from the City Planning Commission concluded resulted in this proliferation of residential short-term rentals. And I do want to make a distinction between a residential short-term rental and a commercial short-term rental. The problem here was the impact it was having on the community and in the neighborhoods. We, the issue is not, you know, a commercial short-term rental would be in a district. The problem here is, as anyone who's lived in a neighborhood with many Airbnbs and prolific transient lodging establishments, there's a bachelorette party every weekend. There are people coming from out of town here and they don't live here, they're not part of this community, they're causing nuisances, they're causing problems to the members of the community who have their own property rights and they have the right to live in a community and choose where to live and move into a specific community for their reasons. This, having unfettered short-term rentals, it not only impacts community members, but it destroys all zoning authority. Again, if this is a residential use, if leasing is a residential use, then cooking, preparing food in a kitchen for paying customers at a restaurant is also a residential use. Serving alcohol out of a garage would also be a residential, and selling to paying customers would also be a residential use, if you follow their logic. That is why we pass these ordinances, to address these concerns in the community and to preserve what makes the city great. And it is for this and many other reasons that the court should affirm the decision of the lower court. And I will take questions, should the court have any, but. Okay. Thank you. Thank you. I appreciate your argument and we appreciate that we're getting a rebuttal. Thank you, Your Honor. Just a few points in rebuttal. First, on the takings clause, my friend really doesn't give you an argument on the central factors. He just says this isn't even an open issue in this court because of Hignall. That's flat wrong, as we explained in the briefs. Hignall 1 was focused narrowly on an argument that the license that was granted by the city was a property right that was protected by the takings clause. That's not the nature of the argument here. Hignall 2 is even further afield because that was a substantive due process claim, and the word takings does not appear in that opinion anywhere. And I think you are particularly on a clean slate with respect to Penn Central, because none of those cases were Penn Central. They don't talk about Penn Central. And then when you get to the Penn Central test, it is a three-factor test where the first two factors are conceded. Those are the most important factors, as the Supreme Court tells us in the Lingle case. And I didn't really hear any response on our arguments about the third factor and how draconian this particular regime is. So this isn't just a matter of putting record-keeping requirements or making people sort of keep, you know, very careful records. So if they want to enforce noise ordinances, that they can do so and they'll know who was in the property at the time, and they can facilitate that. If that's what this case were about, we wouldn't be here. But this is a complete foreclosure for my clients for doing these short-term rentals. Now my friend relies on this sort of, I have to call it a canard, that this is a non-residential use. I mean, you know, this is no more or less residential a use than a monthly rental. And it's, you know, courts across the country have rejected the argument that renting your property to have somebody else reside in it is something like a commercial use, like operating a bar or something. It's fundamentally different. This is a residential use of the property. And I do have, with all due respect to my friends and this lovely city, if the concern is preserving the quiet nature of these residential areas, I mean, I don't think the reason that it's noisy in the French Quarter is because there are short-term rentals. And I know that because the city completely bans them in the French Quarters. And there are ways to preserve the quality of neighborhoods that don't visit particular disabilities on particular homeowners in the way that this does. Now with respect to Salesforce, my friend says that Section 230 in Salesforce is his case. It fundamentally isn't. And Salesforce, completely distinguishable, is the only one after Salesforce who wasn't a publisher at all. And this court basically said that's not a 230 case. But they even said in passing that if they'd gone after back pages, it might have been a 230 case. So ask the question, why is the city going after Airbnb here? They're going after Airbnb because it is the publisher of the listings. And with, again, all due respect to my friend, the idea that Section 230 doesn't apply to Airbnb the way it does to the social media companies because people go to the social media companies for other content and we have a different business model, that is flat wrong. There's no case law that supports that. Section 230 is indifferent to the business models that these various Internet companies do. What they're concerned about is whether they're being treated as a publisher. That's the functional test of this court. And there's no question, of course Airbnb is being treated as a publisher. Why do people go to Airbnb? To see the listings. And that is a publication function. And under this court's functional test, I do think the fact that the record evidence shows that Airbnb would limit and monitor only the compliant listings, that's enough to give you the functional test that Section 230 applies. Thank you. Okay, thank you for your argument. We appreciate both sides arguments and we will decide this case. And we are now going to take a short break, 10-minute break, and then we'll come back for the third case.